Ed SMITH, Plaintiff,

v.

AVSC INTERNATIONAL, INC., Dr. Amy Pollack, Thomas Gray, and Jeanne Haws, Defendants.

No. 00 Civ. 9832(RWS).

United States District Court, S.D. New York.

June 26, 2001.

Shneyer & Shen, New York, NY (Michael Shen, of counsel), for plaintiff.

Reed Smith, New York, NY (Andrew L. Morrison, Amanda M. Fugazy, of counsel), for defendants.

### OPINION

SWEET, District Judge.

In lieu of answering the complaint (the "First Complaint"), defendants AVSC International, Inc. ("AVSC"), Dr. Amy Pollack ("Pollack"), Thomas Gray ("Gray"), and Jeanne Haws ("Haws") have moved to dismiss the claims against them pursuant to Fed.R.Civ.P. 12(b)(6) as follows: (1) all claims against Pollack; (3) the Third Cause of Action against Gray; (4) the First, Second and Fourth Causes of Action against Haws; (5) the Fifth Cause of Action in its entirety; and pursuant to Fed. R.Civ.P. Rule 12(e) and (f), (6) to strike certain matters as scandalous or irrelevant and for a more definite statement. Plaintiff Ed Smith ("Smith") has opposed the motions, and, in the alternative, moves to replead any dismissed claims.

On June 7, 2001, Smith filed a second complaint (the "Second Complaint"), No. 00 Civ. 5054(RWS), which alleged two counts of federal civil rights violations against AVSC based upon the same facts alleged in the first complaint. By agreement of the parties, the motion to dismiss is applied to both complaints.

For the reasons set forth below, the defendants' motions are granted in part and denied in part, and Smith is granted leave to replead.

### The Parties

Smith, a 47 year-old white male residing in Oakdale, Pennsylvania, is a certified

public accountant ("CPA") and was employed as a Controller of AVSC from September 1998 until his termination on September 20, 2000.

AVSC is a not for profit corporation providing global family planning services in conjunction with, among others, the United States Agency for International Development ("USAID"). AVSC is headquartered in New York City.

At all times relevant to this action, Pollack, who resides in New York, was, and still is, President of AVSC.

From the time Smith joined AVSC until on or about August 17, 2000, Gray was the Chief Financial Officer at AVSC and Smith's direct supervisor. Gray resides in New York.

At all times relevant to this action, Haws was, and still is, Vice President of Human Resources at AVSC. Haws resides in New York.

### Prior Proceedings

The first complaint, No. 00 Civ. 9832(RWS), was filed on December 29, 2000 and alleges five causes of action against each of the defendants: (1) against "defendant employer and its agents" for "discrimination ... with respect to harassment, hostile environment, wages, promotion, termination, and other terms and conditions of employment because of sex or sex plus age, in violation of the New York State Human Rights Law," and aiding and abetting the same; (2) the same grounds, in violation of the New York City Human Rights Law; (3) retaliation and discrimination on the same grounds, because of "age or age plus sex," in violation of the New York State Human Rights Law; (4) discrimination because of "age or age plus sex" in violation of the New York City Human Rights Law; and (5) breach

of implied contract to comply with the ethical rules of the accounting profession.

The defendants filed this motion to dismiss, to strike, and to clarify, on March 2, 2001. Smith opposed on March 30, 2001. Defendants filed a reply brief and the motion was deemed fully submitted after oral argument on April 18, 2001.

While the motion was *sub judice*, the second complaint was filed on June 7, 2001. The second complaint alleges that the same conduct by the same defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. By agreement of the parties, the motion to dismiss is considered with respect to both complaints.

### Facts

The following is a synopsis of the twenty pages of facts Smith alleges in the First Complaint (which are duplicated in the Second Complaint). These facts are deemed to be true for the purpose of this motion to dismiss.

Smith alleges that AVSC has a pattern and practice of discriminating against men and/or older [1] men in hiring, income, promotions, termination, and other terms of conditions of employment. (Compl.¶¶ 11–14, 41.) The complaints set forth in detail various acts committed by Gray against employees other than Smith, including acts of sexual and racial discrimination, harassment (Compl.¶¶ 17a-j), and improper financial transactions (Compl.¶ 18–22, 22a-ff). The other defendants condoned Gray's behavior or took no action to remedy it (Compl.¶¶ 42–48).

The complaints assert that the defendants committed two discriminatory acts against Smith personally. First, although Smith had expressed interest in applying

---

**1.** For ease of reference, Smith will hereinafter be referred to as an "older" white male, as a means of highlighting his age relative to other AVSC employees, not as an empirical matter.

for the position of Senior Director of Finance and Administration, and his then-supervisor Gray had announced to the staff that Smith would be promoted to that position, Gray subsequently asked Smith to consider the position of International Controller. Smith accepted this proposal, and also agreed to be promoted to the Senior Director, would continue to report to the CFO, be able to work from home one week per month, and visit field offices two or three weeks of each month. (Compl.¶¶ 34–36.) However, a less-qualified woman in her twenties was promoted as Senior Director in Smith's stead because, as Gray told him, she had "more of a future at AVSC than Mr. Smith" (Compl.¶ 40.) Gray later asked Smith why he, a forty-something man, would want to work for Gray, who was in his thirties. (Compl.¶ 39.) AVSC, Haws and Pollack were aware of Gray's actions, but did not discipline him. (Compl.¶ 42.)

Second, the defendants "set up" and retaliated against Smith for reporting sexual harassment and financial misconduct (Compl.¶¶ 49–73), which, Smith alleges, not only discriminated against him on the basis of sex and/or age, but also breached his implied contract with AVSC to follow the ethical reporting standards of the accounting profession. Specifically, during the spring of 2000, Haws asked Smith for assistance in documenting Gray's improprieties, which he did on August 14, 2000. (Compl.¶¶ 49–52.) At the same time, Smith notified Haws that Gray had sexually harassed other AVSC employees, that Smith was being subjected to harassment based upon his sex and age, and that AVSC legal counsel, Nina Peckman ("Peckman"),[2] in particular, had sexually harassed Smith by "continually harassing [him] to participate in sexual activity with

her and Mr. Gray, and to procure a black employee to have sex with her...." (Compl.¶¶ 52–53.) In addition, Smith informed Haws and another AVSC executive that he was considering communicating with USAID about AVSC's improper financial practices. (Compl.¶ 54.)

On Wednesday, August 16, 2000, Gray received a threat to the life of his family. (Compl.¶ 57.) The next day, Pollack announced that Gray had resigned from AVSC. Haws took over as Smith's supervisor, and instituted more rigorous work standards, not allowing him to "telecommute," imposing deadlines, and not allowing him to use sick time to "recover from the stress of the past few days." (Compl.¶¶ 63–65.) Smith notified Haws on Monday, August 21, 2000, that he was applying to replace Gray as Chief Financial Officer. (Compl.¶¶ 57–59.)

On September 20, 2000, Smith notified Haws and another senior executive that he had contacted AVSC's external auditor, Arthur Anderson, about accounting misconduct at AVSC. (Compl.¶ 66.) One hour later, Pollack terminated Smith for insubordination and offered Smith a $16,000 severance package in exchange for signing a general release and a confidentiality agreement. (Compl.¶¶ 67–68.) Smith refused, and received no severance package. (Compl.¶ 69.) He alleges that his termination was "motivated by retaliation and discrimination based on sex and/or age," (Compl.¶ 70), as well as because he "complained about [Gray's] fraudulent financial and business practices...." (Compl.¶ 72.)

## Discussion

### I. Relevant Legal Standards

#### A. Rule 12(b)(6) Motion to Dismiss

In reviewing a motion to dismiss under Rule 12(b)(6), courts must "accept as true

---

2. The complaint alleges that Peckman is still employed at AVSC. (Compl.¶ 56.) She is not named as a defendant in these actions.

the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). Review must be limited to the complaint and documents attached or incorporated by reference thereto. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). In this context, the Second Circuit has held that a complaint is deemed to "include ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000). However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988).

" '[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). *See also Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986).

## B. *Federal Civil Rights Laws*

The Second Complaint contains two causes of action alleging that AVSC discriminated against Smith "with respect to harassment, hostile work environment, wages, promotion, termination and other terms and conditions of employment" (1) on the basis of "sex or sex plus age" or "age or age plus sex" in violation of Title VII; and (2) on the basis of "age or age plus sex" in violation of the ADEA.

Title VII renders it unlawful for "an employer":

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., extends the same protection to persons over the age of forty. 29 U.S.C. §§ 623(a)(1), 631(a).

■ The same evidentiary framework applies to both age and sex discrimination claims. *See Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198–99 (2d Cir.), *cert. denied*, 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc). Both Title VII and the ADEA provide only for "employer" liability, *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–17 (2d Cir.1995) (Title VII); *Martin v. Chemical Bank*, No. 95–9015, 96–9365, 129 F.3d 114, 1997 WL 701359, *3 (2d Cir. Nov. 10, 1997) (table), and share the same definition of "employer," *compare* 29 U.S.C. § 630(b) with 42 U.S.C. § 2000e(b).

While alleging that he was discriminated against on the basis of his sex, and because of his age, Smith also claims "sex plus age" and "age plus sex" discrimination. "Sex plus" discrimination has been widely recognized by the courts. *See, e.g., Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Fisher v. Vassar College,* 70 F.3d 1420, 1448 (2d Cir.1995) (*Fisher I* ) ("The Supreme Court has adopted the proposition that sex considered in conjunction with a second characteristic—'sex plus'—can delineate a "protected group" and can therefore serve as the basis for a Title VII suit."), *on reh'q in banc,* 114 F.3d 1332 (2d Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). This doctrine recognizes that it is impermissible to treat men with an additional characteristic more or less favorably than women with the same additional characteristic.[3]

## C. *New York City and State Human Rights Laws*

■ Although the applicable federal civil rights statutes do not provide a cause of action for individual liability, New York courts otherwise require the same showing for claims brought under the HRL and federal sex discrimination claims brought under Title VII, and age discrimination claims brought under the ADEA. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) (HRL follows ADEA); *Leopold v. Baccarat, Inc.,* 174 F.3d 261 n. 1 (2d Cir.1999) (HRL follows Title VII); *Tomka v. Seiler,* 66 F.3d 1295, 1305 n. 4 (2d Cir.1995); *Miller Brewing Co. v. St. Div. of Human Rights,* 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985).

■ The New York City Human Rights Law ("City HRL") renders it unlawful for "an employer or an employee or agent thereof, because of the actual or perceived age ... [or] gender ... of any person ... to discharge from employment such person or to discriminate against such person," N.Y.C. Admin. Code. § 8–107(1)(a), and further provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so," N.Y.C. Admin. Code § 8–107(6). A prerequisite for holding a defendant liable under these provisions is that the defendant at issue must have actually engaged in a discriminatory act. *See Stallings v. U.S. Electronics, Inc.,* 270 A.D.2d 188, 707 N.Y.S.2d 9 (N.Y.App.Div.2000).

The New York State Human Rights Law ("State HRL") also provides for individual liability, but limits liability to the plaintiff's "employer" for discrimination, *see* N.Y. H.R.L. § 296(1), and to "any person" for aiding and abetting the employer's discrimination, *see* N.Y. H.R.L.

---

**3.** The status of the "sex plus age" and "age plus sex" claims is unclear. In 1999, the Sixth Circuit declined to recognize a cause of action for "sex plus age" discrimination on the grounds that "no Federal Court of Appeals (including this one) nor the Supreme Court has recognized such a cause of action." *Sherman v. American Cyanamid Co.,* 188 F.3d 509, 1999 WL 701911, *5 (6th Cir.1999) (table). However, in 1997, the Second Circuit reviewed a "sex plus age" case in *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, and, without analyzing the cause of action as such, held that the jury should have been instructed that "age was a motivating factor," but that the error was harmless. 135 F.3d at 222. Only one reported decision addresses "age plus sex" discrimination, but that decision, although recognizing the cause of action, relied on Title VII and construed it as a "sex plus age" case, rather than one arising under the ADEA. *Arnett v. Aspin,* 846 F.Supp. 1234, 1237 (E.D.Pa.1994). In any case, defendants have not challenged the "sex plus" or "age plus" formulations in this motion, so the issue need not be addressed at this time.

§ 296(6).[4] New York courts are divided in deciding which standard of liability to apply under the State HRL. *See Ponticelli v. Zurich American Ins. Co.*, 16 F.Supp.2d 414, 439 (S.D.N.Y.1998) ("Two theories of individual liability have been recognized by courts under the HRL.").

The first approach uses a "control test," and defines an "employer" under the State HRL as a person with either an ownership interest in the company or some form of control over the plaintiff's employment status. *See Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984).

The second approach allows plaintiffs to pursue actions for aiding and abetting discrimination pursuant to § 296(6) regardless of control, as long as the defendant actually participated in the discrimination. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ In order to withstand a 12(b)(6) motion in an employment discrimination case, a plaintiff must only make out a prima facie case of discrimination. *See Dugan v. Martin Marietta Aerospace*, 760 F.2d 397, 398–99 (2d Cir.1985). Here, Smith alleges that he has been the subject of discrimination and retaliation for reporting discrimination "with respect to harassment, hostile environment, wages, promotion, termination, and other terms and conditions of employment," because of sex, sex plus age, age, or age plus sex. (Compl.¶¶ 75, 79, 83, 87.)

At a minimum, both the City and State HRL require a plaintiff to allege that the defendant engaged in a discriminatory act against the plaintiff in order to withstand a motion to dismiss. *See Stallings*, 270 A.D.2d 188, 707 N.Y.S.2d 9. That the defendants engaged in or aided and abetted discriminatory acts aimed at persons other than the plaintiff has no bearing on Smith's claim that the defendants harassed him, because he has no standing to assert claims on behalf of non-similarly situated persons. *See, e.g., Sidari v. Orleans County*, 174 F.R.D. 275, 283 (W.D.N.Y. 1996) ("the applicable case law requires the conclusion that a white male corrections officer lacks standing to maintain a claim of discrimination under Title VII based on conduct by other whites against blacks or inmates.").

### D. *Prima Facie Case*

### 1. *Hostile Work Environment*

A hostile work environment claim can be established by a showing that the plain-

---

4. The relevant provisions of the HRL are New York Executive Law § 296 subsections (1) and (6), which provide in pertinent part:

 (1) It shall be an unlawful discriminatory practice

 (a) For an employer ... because of the age, race, creed, color, national origin, sex, disability, ... of an individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. [ ... ]

 (e) For any employer ... to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article. . . .

 (6) It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so. . . .

 It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practice forbidden under this article. . . .

 N.Y. Exec. Law. § 296(1), (6), (7).

tiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (*quoting Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also Murray v. New York University College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). In order to state a claim for hostile environment harassment, a complaint must allege conduct severe or pervasive enough to create a work environment that a reasonable person would find hostile or abusive, and it must allege that the plaintiff subjectively perceived the environment to be hostile. *Id.* at 21–22, 114 S.Ct. 367. "To be pervasive, the incidents of discrimination must be repeated and substantially continuous—over a substantial period of time." *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 182–83 (2d Cir.2001).

 Allegations of harassing acts against other employees may be relevant to a hostile work environment claim. *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 190 (2d Cir.2001) ("we recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). However, the other employees targeted must be in the same protected class as the plaintiff for the hostile work environment claim to withstand a motion to dismiss. *See id* at 186 (holding that plaintiff's hostile work environment claim was proper because she "is a member of the protected class that she claims was subjected to discrimination," unlike other cases in which courts dismissed hostile work environment cases where "the plaintiff asserted Title VII

rights on behalf of a protected class of employees to which the plaintiff did not belong.").

### 2. Non–Hostile Work Environment Employment Discrimination

Smith's claims for "harassment ..., wages, promotion, termination, and other terms and conditions of employment" are governed by a different standard than his hostile work environment claim. Non-hostile work environment discrimination claims involve four elements: (1) the plaintiff is a member of a protected class (2) who was qualified for his position (3) and suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998). As set forth above, both the City and State HRL also require Smith to allege that each individual defendant engaged in some discriminatory act if those claims are to withstand their motions to dismiss.

 An employment action is adverse if it inflicts a "materially adverse change" in the terms and conditions of the plaintiff's employment. *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significant diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (citation and internal quotations omitted).

### 3. Retaliation

To make out a prima facie case for discriminatory retaliation, Smith must plead each of the following factors: (1)

Smith engaged in a statutorily protected activity; (2) the employer knew of it; (3) the defendant took "adverse employment action" against him; and (4) there is a causal connection between the exercise of the protected activity and the adverse action. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997) (retaliation claims brought under ADEA approached in the same way as claims under Title VII); *Feder v. Bristol–Myers Squibb Co.*, 33 F.Supp.2d 319, 337 (S.D.N.Y.1999). Here, Smith alleges that he was subjected to altered working conditions and subsequently terminated in retaliation for reporting Gray's fraudulent accounting and discriminatory conduct toward other AVSC employees, as well as the sexual propositions he frequently received from Peckman.

Unlike the harassment claim, Smith's discriminatory retaliation claim may succeed on a theory that the defendants terminated him for reporting discrimination against others, because the act of reporting is statutorily protected. *See, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (protected activity includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.").

Finally, a "causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (*quoting DeCintio v.*

*Westchester County Med. Ctr.*, 821 F.2d 111, 115, *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

## II. *The Motion to Dismiss the Discrimination Claims is Granted*

### A. *The Hostile Work Environment Discrimination Claims Are Dismissed*

Smith's complaint alleges in graphic detail various acts of harassment Gray committed against "women and minority employees" (Compl. ¶ 16; *see also* Compl. ¶¶ 17a-j (enumerating specific discriminatory conduct against female, Filipino, Egyptian, Jamaican, Indian, and Nigerian employees)), but fails to allege any specific acts to support the claim that his work environment was hostile to older white men as a general matter. The only claim that approaches this showing—"Employees over the age of 40 have been disproportionately terminated and otherwise discriminated against by AVSC and its agents"—is insufficient to support a cause of action for hostile work environment. (Compl.¶ 41.) As such, Smith has failed to state a claim for hostile work environment discrimination. *See Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 186 (2d Cir.2001).

The hostile work environment component of the first four causes of action in the First Complaint, and in each cause of action in the Second Complaint are therefore dismissed with leave to replead.

### B. *The Non–Hostile Work Environment Discrimination Claims are Dismissed Against Haws and Pollack*

#### 1. *Smith Is a Qualified Person Who Falls Within a Protected Class*

Smith falls within a protected class both as a white male, *see McDonald v. Santa*

*Fe Trail Transp. Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976); *Silver v. City University of New York*, 767 F.Supp. 494, 497 (S.D.N.Y.1991), and as a person over the age of forty, *see Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). Moreover, he has alleged without dispute that he is qualified for the position he held. (Compl.¶ 16.)

### 2. *Adverse Employment Action*

In essence, the complaints assert that the defendants undertook two adverse employment actions against Smith: (1) imposing new standards, such as deadlines, use of personal time rather than vacation time to deal with "stress," and inability to telecommute; and (2) terminating him.

■ Pleadings setting forth the collective actions of the "defendants" fail to make out a prima facie HRL case for individual liability against any defendant who is not alleged to have taken part in other specific acts. *Leykis v. NYP Holdings, Inc.*, 899 F.Supp. 986, 994 (E.D.N.Y. 1995) ("Plaintiffs' use of the word 'defendants' is insufficient to allege individual action by Murdoch where no other facts are alleged in support of individual liability. The conclusory allegations that 'defendants' (plural) participated in the allegedly discriminatory policies does not give Murdoch notice of his conduct that gives rise to HRL liability.").

As such, the First Complaint only states a claim against each individual defendant for a violation of New York civil rights laws to the extent that Smith alleges that he or she engaged in at least one adverse employment act against him. *See Falbaum v. Pomerantz*, 891 F.Supp. 986, 992 (S.D.N.Y.1995) (dismissing individual liability claims under HRL because complaint failed to "identify specific discriminatory employment decisions by any particular defendant with respect to particular plaintiffs...."); *Stallings*, 270 A.D.2d 188, 707 N.Y.S.2d 9. Defendants allege that the complaint fails to state a claim against either Haws or Pollack on this basis.[5]

#### a. *Haws*

■ Although it is unclear from the complaint itself, Smith's brief states that his claim against Haws is for both discrimination and aiding and abetting as an "employee" under the City HRL, and only for "aiding and abetting" under § 296(6) of the State HRL. (Smith Br. at 5 n.5.)[6] As to Haws, the complaint alleges only that: Haws took part in "setting him up" to be fired by (1) asking him on two occasions to come forward with information about Gray's various improprieties, while promising to protect him from retaliation (Compl.¶¶ 49, 50); and, after he did so and Gray was forced to resign, Haws (2) "harassed" Smith by requiring him to observe a variety of new working conditions, such as not allowing him to work from home and imposing deadlines, when she took

---

**5.** Defendants do not contest that the First Complaint alleges that Gray engaged in discriminatory actions against Smith. (Def. Br. at 8 ("Plaintiff has failed to meet even the minimum pleading requirements for age and sex discrimination as to Haws and Pollack under both the State and City laws....")). The failure to give Smith his promised promotion, hiring a less qualified younger woman for the position, and then commenting

about Smith's "future" at AVSC given his age, constitute "adverse employment actions" that raise an inference of discriminatory motivation. (Compl.¶¶ 34–40.)

**6.** Smith also argues that his only § 296(1) claim is against AVSC. (Id.) The repleaded complaint must clarify which specific claims are asserted against each defendant.

over as his supervisor (Compl.¶¶ 63–65).[7]

These changes do not constitute "adverse employment actions" as a matter of law. *See Henriquez v. Times Herald Record*, No. 97–9637, 165 F.3d 14, 1998 WL 781781, at *1 (2d Cir. Nov. 6, 1998) (table) (urging plaintiff to meet shortened deadlines and accept heavier workload while working on weekends held not an adverse employment action) (*citing Torres v. Pisano*, 116 F.3d 625, 639–40 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997)); *Little v. New York*, 96 Civ. 5132, 1998 WL 306545 at *5–6 (E.D.N.Y. June 8, 1998) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most ...."), *aff'd*, 1999 WL 220147, 173 F.3d 845 (2d Cir.1999); *Cooper v. New York State Dep't of Human Rights*, 986 F.Supp. 825, 828 (S.D.N.Y. 1997) ("the mere fact that an employee has been transferred or that his job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions").

Adverse employment action is also an element of the HRL retaliation claims. Therefore, Haws's motion to dismiss the remaining discrimination claims as set forth in the First, Second, and Fourth causes of action in the First Complaint, is granted.

#### b. *Pollack*

 The complaints assert that Pollack was the person responsible for terminating Smith. This allegation meets both the adverse employment action element of the prima facie case of Title VII and the ADEA, and the standard for individual HRL liability against Pollack pursuant to the First Complaint. *See Galabya*, 202 F.3d at 640.

#### 3. *Inference of Discriminatory Motivation*

 Defendants argue that Smith was terminated not for any discriminatory reason, but simply for insubordination because he circumvented the AVSC hierarchy by speaking to Arthur Anderson about Gray's financial misdeeds. While acknowledging—and in fact highlighting—the nondiscriminatory finance-related motivation for his termination, the complaint never enumerates any act or statement by Pollack from which it can reasonably be inferred that she was motivated by a discriminatory animus toward Smith.

The only acts alleged by any defendant that raise a reasonable inference of discrimination are the statements attributed to Gray regarding Smith's age and "future" at AVSC (Compl.¶¶ 39, 40), which raise an inference of discrimination when viewed in connection with his failure to promote Smith in favor of a younger woman.

Therefore, Pollack's motion to dismiss the remaining discrimination claims against her as set forth in the First, Second, and Fourth causes of action in the First Complaint, is granted.

#### C. *The Retaliation Claims are Dismissed*

 Although Smith's termination was an adverse employment action, the complaint fails to raise an inference of a causal

---

**7.** The failure to discipline Gray for acts that were fraudulent and discriminatory toward persons other than Smith, as alleged in Paragraphs 42, 43 and 61, neither constitutes a discriminatory act against Smith nor supports his retaliation claim. *See, e.g., Sidari*, 174 F.R.D. at 283. On the contrary, that Gray was forced to resign soon after Smith came forward (Compl.¶¶ 52, 55), suggests that the defendants were in fact responsive to Smith's concerns.

connection between Smith's termination and his reporting of Gray's conduct. Rather, the facts set forth in the complaint give rise to the inference that he was the "retaliation," if it can be so termed, was the result of Smith's communication of sensitive financial information with Arthur Anderson. As discussed in more detail below, his act may have been insubordinate, or required by the ethical tenets of the accounting profession, or both, but firing him for doing it is not discriminatory retaliation under the applicable civil rights laws.

Smith's argument, that the defendants "set him up" by asking him to report Gray's misconduct as an excuse to terminate Smith, is belied by the fact that Gray was terminated within three days after Smith made his complaint. This fact suggests responsiveness rather than a desire to retaliate. Where, as here, management responded with concern to a complaint regarding discrimination, it is the discriminating person, not the others, from whom a complainant fears retaliation. Yet, because Gray left AVSC by August 17, 2001, Gray simply was unable to retaliate against Smith by taking adverse employment action against him. Although the plaintiff's burden of proving a prima facie case is "minimal," *Hicks v. St. Mary's Honor Ctr.*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the facts he has presented in the complaint in support of his breach of contract claim directly contradict his discrimination and retaliation claims.

The motion to dismiss the retaliation claim in the Third Cause of Action is therefore granted.

### III. *The First Complaint Fails to State a Claim for Breach of an Implied Contract*

In New York, employment for an indefinite term is "presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even no reason." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). New York courts are loath to imply terms relating to professional ethical obligations in at-will contracts, with the limited exception of lawyers in law firms. In *Wieder v. Skala*, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), the New York Court of Appeals found that a law firm had violated an implied contract with plaintiff attorney in firing him for insisting upon reporting professional misconduct by fellow associates, as is required by the Code of Professional Responsibility.

In carving out this exception to the general rule, *Wieder* did not overrule *Murphy* or *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987), which both involved accountants. In *Murphy*, the Court of Appeals declined to uphold breach of implied contract claims brought by an in-house accountant at a large manufacturing firm who was terminated for reporting colleagues' financial improprieties to corporate management. Distinguishing *Murphy*, the *Wieder* court noted that although accountant Murphy "performed accounting services, [he] did so in furtherance of [his] primary line responsibilities as part of corporate management," whereas in *Wieder*:

> the plaintiff's performance of professional services for the firm's clients as a duly admitted member of the bar was at the very core, and, indeed, the only purpose of his association with defendants. Plaintiff's duties and responsibilities as a lawyer and as an associate of the firm were so closely linked as to be incapable of separation.

80 N.Y.2d at 635, 593 N.Y.S.2d 752, 609 N.E.2d 105. Moreover, the *Wieder* court

stressed the "distinctive relationship between a law firm and a lawyer hired as an associate," *id.*, as well as the "unique characteristics of the legal profession," in justifying its limited holding, *id.* at 637, 593 N.Y.S.2d 752, 609 N.E.2d 105.

Despite the great lengths the *Wieder* court took to limit its holding to attorneys, other New York courts have extended it to physicians, *see Horn v. New York Times*, 2000 N.Y. Slip Op. 20570, 186 Misc.2d 469, 719 N.Y.S.2d 471 (N.Y.Sup.Ct.2000), and securities brokers, *see Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc.2d 698, 611 N.Y.S.2d 1019 (N.Y.Sup.Ct.1994). Several New York courts have addressed the applicability of *Wieder* to accountants and explicitly rejected it. *See Plaintier v. Cordiant plc*, No. 97 Civ. 8696(JSM), 1998 WL 661474 *3 (S.D.N.Y. Sept. 24, 1998) (certified public accountant who worked as a Director of Finance and Administration had no claim for breach of implied contract after termination for refusing to engage in illegal business practices); *McGrane v. The Reader's Digest Association, Inc.*, 822 F.Supp. 1044 (S.D.N.Y.1993) (magazine's fraud investigator had no claim for breach of implied contract after termination for reporting financial wrongdoing pursuant to professional accounting standards).

It appears that only one reported case took a more favorable view of an implied contract to observe professional accounting standards pursuant to *Wieder*. In *Wolde–Meskel v. Tremont Commonwealth Council*, No. 93 Civ. 6515(LMM), 1994 WL 167977 (S.D.N.Y. April 29, 1994), the Honorable Lawrence M. McKenna denied a motion to dismiss a breach of implied contract claim brought by an accountant who worked as the Assistant Fiscal Director of a non-profit corporation that contracted with the State of New York. The plaintiff had been terminated after reporting financial misconduct of fellow employees to New York State authorities who oversaw the organization's contracts. *Id.* at *1. The plaintiff argued that, he was under heightened professional obligations compared to the plaintiff accountants in *Murphy* and *Sabetay*, because he worked for a non-profit organization that contracted with the state, rather than a large profit-making corporation. *Wolde–Meskel*, 1994 WL 167977, at *6 n.3. Judge McKenna specifically declined to "expand the public policy exception on this basis" in light of *Murphy, Sabetay*, and the limitations of *Wieder*, but nonetheless elected to deny the motion to dismiss while "not reach[ing] the issue of whether Plaintiff may successfully allege that his termination was in response to his reporting of criminal activities." 1994 WL 167977, at *6 n.3.

█ Smith argues that because he was hired solely as an accountant, his professional ethical obligations were "at the core" of his employment, as in *Wieder.* However, Smith's position is more analogous to that of *Murphy* and *Sabetay*, who were accountants working in financial departments of large companies. *See Wieder*, 593 N.Y.S.2d at 755, 609 N.E.2d 105 ("Although [the plaintiffs in *Murphy* and *Sabetay* ] performed accounting services, they did so in furtherance of their primary line responsibilities as part of corporate management.") Moreover, the facts alleged in the complaint demonstrate that a significant part of Smith's duties as Controller were administrative, rather than purely financial, in nature. (Compl. ¶ 36 (noting that Smith "would continue to ... travel to the field offices two to three weeks of each month.").)

Despite the lack of favorable precedent, Smith nonetheless argues that because his ethical reporting obligation was statutorily required, he falls into a class of cases left open by *Murphy* and followed in subsequent opinions. The plaintiff accountant

in *Murphy* had been terminated after notifying corporate management about accounting improprieties by fellow employees. Although the company's internal regulations required Murphy to make that disclosure, the court held that "absent a constitutionally impermissible purpose, *a statutory proscription*, or an express limitation in the individual's contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." 58 N.Y.2d at 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (emphasis added). *See also Horn*, 719 N.Y.S.2d at 474 ("no physician should be placed in the position of choosing between either retaining employment or violating the ethical standards provided by State statutes and regulations as well as by the relevant professional association"); *McGrane*, 822 F.Supp. at 1048 (distinguishing "privately issued set of standards or rules" applicable to plaintiff accountant, from the Code of Responsibility, which was adopted by the Appellate Division of the New York Supreme Court).

Smith contends that as a certified public accountant licensed by the Commonwealth of Pennsylvania and a member of the American Institute of Certified Public Accountants, he is subject to certain ethical requirements of that have been codified in Pennsylvania statute. (Compl.¶¶ 23, 24.) For example, he cites the C.P.A. Law of May 26, 1947, P.L. 318 (the "Penn. CPA Law"), which authorizes the Pennsylvania Board of Accountancy to "revoke, suspend, limit or otherwise restrict the certificate of a certified public accountant ... for ... violation of a rule of professional conduct promulgated by the board." Penn. CPA Law § 9.1(a)(4). (*See also* Smith Br. at

12–13 n. 7 (citing other Pennsylvania statutory provisions).)

This Court declines to expand *Wieder* to include claims by accountants who allege they were terminated from non-profit, state-funded organizations for acting pursuant to state statute. Such a claim has been notably rejected by the Honorable John G. Koeltl in *Fry v. McCall*, 945 F.Supp. 655 (S.D.N.Y.1996). Plaintiff Fry, the Director of the Bureau of Agency Analysis of the Office of the State Deputy Comptroller for the City of New York, raised a breach of implied contract claim after being terminated for voicing concerns about audit reports her office had issued. Noting that Fry was terminated for exercising her general professional ethical obligations, the court nonetheless granted the defendants' motion to dismiss. As Judge Koeltl held,

> Employers do not have the right to fire their employees in violation of statutory or constitutional mandates. However, such violations give rise to claims under those laws ... themselves, they do not create a separate cause of action for breach of contract under New York law. Were it otherwise, any firing in violation of a statute or constitutional mandate would also give rise to a breach of contract claim.

945 F.Supp. at 667. Although Fry's reporting obligations arose from general professional guidelines rather than state statute, Judge Koeltl found that in *Wieder*, "[t]he implication was clear that the circumstances giving rise to an alleged violation of such specific statutory protections did not give rise to an implied breach of contract claim." 945 F.Supp. at 667.[8]

---

8. In a Pennsylvania accounting malpractice action, *The Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Co., P.C.*, Civ. A. No. 91–4919, 1992 WL 196768 (E.D.Pa. Aug.10, 1992), the court recognized that Pennsylvania statutes require accountants to comply with professional ethical obligations, but declined to find that the legal

In lieu of any controlling or persuasive authority having affirmatively approved the cause of action being proffered here under similar facts, the limitations of *Wieder* are controlling. It is difficult to draw a rational distinction between attorneys operating under professional codes of conduct that have been codified into law and accountants working under similar conditions. Presumably, under the logic of Judge Koeltl's decision in *Fry*, Smith may have an action in New York for the violation of relevant Pennsylvania statutes pertaining to accountants' ethical reporting obligations. The availability of such a cause of action ameliorates the Court's discomfort at following New York law as it has been clearly defined in *Wieder*.

Defendants' motion to dismiss the fifth cause of action in the First Complaint is granted.

## IV. *Motion to Strike the Pleadings Pursuant to Rule 12(f)*

Federal Rule of Civil Procedure 12(f) allows a party to request that the Court strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "[M]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Kounitz v. Slaatten*, 901 F.Supp. 650, 658 (S.D.N.Y.1995) (*citing Burger v. Health Ins. Plan of Greater New York*, 684 F.Supp. 46, 52 (S.D.N.Y.1988)).

Pursuant to this Rule, defendants move to strike the following (identical) parts of the First and Second Complaints:

! Paragraphs 17(a-j), which allege various incidents of harassment by Gray against third parties other than Smith;

! Paragraphs 18–22(ff), which allege various fraudulent and improper financial practices by AVSC and its management;

! Paragraphs 23–31, which set forth his accounting certifications and duties;

! Paragraphs 43–48, 54 and 62, which allege additional financial improprieties, deficient internal controls, Smith's attempts to notify AVSC management about this misconduct, and discontinued self-esteem training courses;

! Paragraph 57, which refers to a death threat to his family he received after reporting discrimination at AVSC;

! Paragraph 61, which refers generally to complaints other employees made to Haws and Pollack about Gray; and

! Paragraphs 67 and 68, which set forth the terms of discharge AVSC proposed when Smith was terminated.

(Def. Br. at 18–20.)

As set forth above, specific allegations about Gray's behavior toward other employees who were not also older white men are not relevant to any of Smith's claims. Paragraphs 17(a-j) shall be stricken.

Smith's ethical obligations to report financial misconduct, and specific instances of such acts, are not relevant to the only remaining claims in the complaint, the discrimination claims, and therefore 18–22(ff),

---

requirement translated into an implied contract with the accountant's employer. "Although [the accountant] contracted to act in accordance with GAAS and GAAP [professional ethical standards], the contract is not the source of [his] duty to act with professional care. Rather, [his] duty to act in compliance with arises by law ... [The accountant's]

duty to act in accordance with GAAS and GAAP existed notwithstanding the contract with [his employer]...." *Id.* at *6. Although Pennsylvania law clearly does not apply *Wieder*, a Pennsylvania court's treatment of Pennsylvania accounting statutes in an implied contract action is nonetheless instructive.

24–31, 43–48, 54, and 62 shall be stricken. As Paragraph 23 bears on his job qualifications, it is relevant to his discrimination claims and therefore shall not be stricken.

Paragraph 57, while clearly inflammatory, may remain for the sole purpose of enabling Smith to gather proof of its relevance to his retaliation claim. If he can do so, this allegation will be highly probative of retaliation. Otherwise, it shall be struck upon proper motion after discovery.

Paragraph 61 pertains to the defendants' general receptivity to employee complaints of harassment. As such, it is relevant to Smith's discrimination claims and will not be stricken.

Paragraphs 67 and 68 do not pertain to an inadmissible offer of settlement of litigation, but rather to the terms of Smith's discharge. As such, they are relevant to the motivation for his termination, and will not be stricken.

### V. *Motion for a More Definite Statement Pursuant to Rule 12(f)*

To the extent not already addressed, the motion is denied without prejudice as moot.

### *Conclusion*

For the foregoing reasons, the motions are granted in part and denied in part. Plaintiff is granted leave to replead all of his claims together in a single complaint.

It is so ordered.